John A. MAGEE v. DIRECTOR,
Arkansas Employment Security Department;
and U.S. Agricultural, Inc.

E 00-295                                          55 S.W.3d 321

Court of Appeals of Arkansas
Division I
Opinion delivered September 26, 2001

*Allen Law Firm*, by: *David W. Stirling*, for appellant.

*Phyllis A. Edwards*, for appellee Director of Arkansas Employment Security Department.

JOSEPHINE LINKER HART, Judge. John Ashley Magee appeals a decision of the Arkansas Board of Review ("Board") that affirmed the Appeal Tribunal's denial of unemployment insurance benefits and concluded that he was disqualified from receiving those benefits because he failed to take appropriate steps to prevent the mistreatment that gave rise to his leaving work when he did not discuss his work situation with Allan Magee ("president"), his father and president and a fifty-percent owner of U.S. Agricultural, Inc. ("U.S. Agricultural"). We reverse and remand this matter for additional findings of fact.

Appellant worked for U.S. Agricultural from 1996 until May 9, 2000. While employed by U.S. Agricultural as plant and sales manager, appellant's salary was unilaterally decreased by Ed Howard,

chief financial officer and the other fifty-percent owner of the company. Appellant resigned his position with U.S. Agricultural as a result of Howard's repeated undermining of his authority and the reduction of his salary. On August 10, 2000, the agency determined that appellant was not entitled to unemployment insurance benefits, and appellant appealed to the Appeal Tribunal.

A hearing was held before an officer for the Appeal Tribunal on September 14, 2000. Appellant, the president, and Michelle Wallace testified on behalf of appellant, and Howard testified on behalf of U.S. Agricultural.

Appellant testified that in the position of plant manager at U.S. Agricultural, he was responsible for ordering plant supplies. He stressed that failure to acquire the needed supplies in a timely manner would interrupt production, which would cost the company money. Despite this, Howard would frequently interfere with this effort by either telling plant staff not to place the order or canceling orders already made. Furthermore, Howard also refused to finance projects that would protect inventory from flooding and failed to replace badly-worn forklift tires. These impediments, according to appellant, caused costly disruptions in the plant's operations.

In addition, appellant explained the unwritten policies at U.S. Agricultural that governed pay increases and decreases, which gave appellant sole responsibility for the setting of an employee's wage. Moreover, he stated that the salary increase he received in February 2000, was four months later unilaterally decreased by Howard. Following Howard's decrease of appellant's salary, appellant quit working for U.S. Agricultural.

The president then testified and stated that he agreed with appellant's assessment that Howard had repeatedly undermined appellant's authority and expressed the opinion that[1] Howard

---

[1] The relevant colloquy was as follows:

HEARING OFFICER: Well, as president of the company, did you have some power to exercise to make sure that John Magee got his proper salary?

PRESIDENT: I suppose I could have filed suit and got lawyers, but I think that we're talking about is we're—I think that's—I think you're the one that's getting ready to determine whether I have that power or not. And I don't—I mean, I was the one that authorized the raise

wanted to get rid of appellant. In particular, the president recounted a specific incident in which Howard told the president while pointing at appellant, "the only thing wrong with this plant was that son-of-a-bitch up there. . . ." Regarding the last incident that caused appellant to leave work, the president testified that prior to the date the salary increase was effective he had consulted with appellant and approved the earnings change. Furthermore, he stated that he and appellant had discussed the salary decrease, but he did nothing to rectify the problem. In his view, the only available solution was that he "could have filed suit and got lawyers."

Wallace testified that she was the office manager at U.S. Agricultural and agreed with appellant's testimony that his pay increase was done commensurate with the company's unwritten policy concerning salaries. She also stated that Howard was not typically involved in the setting of salaries and that the undermining of appellant's authority by Howard happened "on a regular basis."

Finally, Howard testified that many of his actions were based on the company's financial situation at the time and that he had stopped talking with appellant because every time they would discuss something, appellant would go "berserk." He also stated that he had talked with the president about appellant's salary increase and the impact the salary change was having on the company's "bad" financial situation. The president agreed to discuss the matter with appellant, but failed to do so. Accordingly, Howard made the change to appellant's salary.

On September 15, 2000, the Appeals Tribunal affirmed the agency's denial of appellant's application for unemployment insurance benefits, reasoning that appellant "did not take reasonable steps to straighten things out before he quit." On appeal, the Board affirmed, concluding that even if it determined that appellant had good cause to quit, he failed to take appropriate steps to prevent the mistreatment from continuing, as required under *Teel v. Daniels*, 270

---

and Ed basically reduced his salary and ran him off.

HEARING OFFICER:    How did Mr. Howard reduce his salary?

PRESIDENT:    He called the (employee leasing) company and they did it.

HEARING OFFICER:    Did he have authority to do this?

PRESIDENT:    In my opinion he didn't.

Ark. 766, 769, 606 S.W.2d 151, 152 (Ark. App. 1980). Specifically, the Board stated that it did "not understand why [appellant] did not discuss the situation with his father, the Owner/President, prior to quitting." From the Board's decision, comes this appeal.

■ Our scope of appellate review in cases such as this is well-settled and oft-stated:

> On appeal, the findings of the Board of Review are conclusive if they are supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. We review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings. Even when there is evidence upon which the Board might have reached a different decision, the scope of judicial review is limited to a determination of whether the Board could reasonably reach its decision upon the evidence before it.

*E.g., Fleming v. Director,* 73 Ark. App. 86, 88, 40 S.W.3d 820, 822 (2001). Because we conclude the Board's decision could not reasonably be reached based upon the evidence before it, we reverse and remand.

### I. Substantial evidence

Appellant first argues that the Board's decision was not supported by substantial evidence. Specifically, he argues that the overwhelming weight of the evidence demonstrates that his authority was routinely undermined by Howard, and that such efforts gave appellant good cause to leave work. In response, appellee argues that the Board's decision was supported by substantial evidence because appellant failed to take appropriate steps to prevent the mistreatment from continuing. In particular, appellee argues that "[i]t is clear from the evidence that [the president] could have resolved the issue of the raise for appellant," and that "[t]here is no evidence that [a]ppellant ever requested [the president's] assistance in this matter."

Pursuant to Ark. Code Ann. § 11-10-513(a)(1) (Supp. 1999), "[i]f so found by the Director of the Arkansas Employment Security Department, an individual shall be disqualified for benefits if he voluntarily and without good cause connected with the work left

his last work." The key term "good cause" is not defined by the General Assembly.

However, in *Teel*, 270 Ark. at 769, 606 S.W.2d at 152, we adopted the definitions of "good cause" as provided in James O. Pearson, Jr., J.D., Annotation, *Unemployment Compensation: Harassment or Other Mistreatment by Employer or Supervisor as "Good Cause" Justifying Abandonment of Employment*, 76 A.L.R.3d 1089 (1977). According to Pearson, *supra* at 1092-1095 (citations omitted):

> Because the courts have employed an objective standard in determining "good cause," it is not possible to state definitely that a particular type of conduct, such as harassment or other mistreatment by an employer, does, or does not, constitute good cause. Rather, it is only possible to state definitely that the answer to this question depends on a consideration of all of the facts and circumstances in each case, since it is well established that "good cause" is a cause which would reasonably impel the average able-bodied, qualified worker to give up his or her employment. . . .
>
> The "average employee" standard applied by itself would indicate that the courts would be interested only in the effects that the employer's mistreatment would have had on an average employee. In other words, the effect that such treatment actually had on the employee in question would appear to be irrelevant under this standard, except as evidence allowing the trier of fact to determine if the average employee would have acted in the same way under such circumstances. . . . [However,] "good cause" is dependent not only on the reaction of the average employee, but also on the good faith of the employee involved. In this context, good faith, which has been held to be an essential element of good cause, means not only the absence of fraud, but also the presence of a genuine desire to work and to be self-supporting. Under this concept, it would appear logical to admit evidence concerning the manner in which the claimant was actually affected by the mistreatment in order to determine if his claim for unemployment compensation was made in good faith.
>
> The fact that good cause is dependent on both the reaction of the average worker and the good faith of the employee involved appears to lead to two basic results concerning eligibility for unemployment compensation. First, if an average employee would not have quit his job, the employee involved may not recover unemployment compensation even though his claim is made in good faith. Indeed, the courts, in determining whether harassment or

other mistreatment constitutes good cause, have often stated that good cause is not to be measured by the needs of the super-sensitive employee and have implied that such an employee is not entitled to benefits merely because his claim is made in good faith. Second, even if the average employee would have left his employment under the circumstances of a particular case, no unemployment compensation can be recovered unless the employee in question acts in good faith in filing his claim. In other words, it appears that an employee who is not bothered by the mistreatment involved, and who is not, therefore, acting in good faith in presenting his claim, cannot recover compensation merely because the average employee would have quit his job under the same circumstances. . . .

Some of the courts considering whether a boss' mistreatment of an employee gives the employee good cause to leave his employment have stated that one of the elements in determining good cause is whether the employee took appropriate steps to prevent the mistreatment from continuing. These courts have implied that it is only after the employee has appealed his case to a higher level of management and has received no satisfaction that he can quit with "good cause."

In this case, the Board simply relied on one factor in their denial of benefits and excluded consideration of the remaining factors. Specifically, the Board merely stated that it found "that even if it determined that [appellant] had good cause to quit, [appellant] did not make reasonable efforts to resolve the situations prior to quitting."

Contrary to the Board's findings, the record plainly exhibits that there were long-held animosities between Howard and appellant, and that appellant had from time to time appealed to the president in order to find resolutions to the various incidents that fed the animosity. For whatever reason and despite the arguable authority to do so, the president did not resolve the matter. Appellant did, on many occasions, appeal his "case" to a higher level of management without obtaining resolution. A stalemate has evolved between two equal owners with equal control. Appellant was in an untenable situation where an appeal for resolution was an exercise in futility. The law does not require an employee to engage in an act of futility as a precursor to obtain employment benefits. Therefore, the Board's finding that appellant did not take appropriate steps to resolve the mistreatment cannot be supported by substantial evidence. Thus, we reverse on this issue.

## *II. Good cause*

Finally, appellant argues that the Board failed to consider whether appellant had good cause to leave work. As stated, the Board assumed, *arguendo*, that appellant had a "case," and his error was the fact that he did not appeal that "case" to a higher level for resolution. On this point, we conclude that the Board has defined "good cause" in a manner inconsistent with *Teel*. The Board's finding plainly requires that under all circumstances employees must take steps to prevent the mistreatment from continuing by appealing their complaint to a higher level of management before they are entitled to unemployment insurance benefits. That, however, is not the law.

Whether an employee fails to appeal mistreatment to a higher level of management for resolution before quitting is an appropriate factor to weigh when determining whether an employee was acting in good faith when he voluntarily left work. Good faith, of course, is neither the beginning nor the end of the analysis when determining whether an employee is entitled to unemployment insurance benefits — the statutory standard is "good cause," not "good faith." However, for reasons expressed by Pearson, a thoughtful examination of whether good cause existed requires that every action taken by an employee pertaining to the alleged mistreatment be measured against the good-faith standard. Therefore, while we agree that under the right circumstances an employee's failure to comply with an employer's established grievance procedure could be evidence of a lack of good faith, we hold that such a finding alone does not trump all other considerations when considering whether an employee had good cause to quit his employment.

Hence, what remains is the pivotal question of whether appellant had good cause to quit his employment. In order for us to affirm the Board's decision, we must determine whether there is substantial evidence to support a finding that appellant did not have good cause to resign his employment with U.S. Agricultural. However, we are simply unable to make such a determination because the Board *assumed* that appellant had good cause to quit work and proceeded to find that his failure to appeal required a denial of benefits. While we hold that the Board erred by finding appellant's failure to appeal justified a denial of benefits, the Board's *assumption* does not constitute an addressable *finding* with regard to whether appellant had good cause to quit work. Thus, we are unable to

undertake a meaningful review and determine whether the law was properly applied by the Board.

██ ██ Despite a relatively complete record, we should not make the necessary findings to determine whether appellant is entitled to unemployment insurance benefits. *See* Ark. Code Ann. § 11-10-529(c)(1) (Supp. 1999) ("In any proceeding under §§ 11-10-523—11-10-530, the findings of the board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive and the jurisdiction of the court shall be confined to questions of law."). As explained by our supreme court in *Reddick v. Scott*, 217 Ark. 38, 41, 228 S.W.2d 1008, 1010 (1950) (citations omitted), while addressing a failure by the Board to make essential findings of fact:

> Where an administrative body is empowered to make findings of fact it is not the province of the courts to discharge that function merely because the administrative agency has not acted. For instance, it has been our consistent practice under the Workmen's Compensation Act to remand the cause to the Commission if that body fails to make a finding upon a pertinent issue of fact. . . . It is not the function of this court to decide such fact questions in the first instance.

Therefore, we remand this matter to the Board for findings of fact upon the issues that are still undecided and for further proceedings consistent with this opinion.

Reversed and remanded.

ROAF, J., agrees.

PITTMAN, J., concurs.