SLIP OPINION

Cite as 2014 Ark. App. 233

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** E-13-287

|  |  |
|---|---|
|  | **Opinion Delivered** April 16, 2014 |
| CHRISTOPHER W. ALLEN<br>APPELLANT | APPEAL FROM THE ARKANSAS<br>BOARD OF REVIEW<br>[NO. 2013-BR-00178] |
| V. |  |
| DIRECTOR, DEPARTMENT OF<br>WORKFORCE SERVICES, and<br>LANGSTON BAG COMPANY<br>APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Judge

### I. *Introduction*

Christopher W. Allen appeals the Arkansas Board of Review's denial of unemployment benefits. Allen applied for unemployment benefits to the Arkansas Department of Workforce Services, and the Department denied his claim. Allen appealed the denial to the Arkansas Appeal Tribunal, and a Tribunal hearing officer held a telephone hearing in December 2012. The Tribunal denied Allen benefits pursuant to Ark. Code Ann. § 11-10-513(a)(1) (Repl. 2012) after finding that he quit work due to the "travelling distance" between his home in Cabot, Arkansas and his work with Langston Bag in West Memphis, Arkansas. Allen appealed the Tribunal's decision to the Board, and the Board affirmed. Allen here appeals the Board's final order, arguing that he is entitled to benefits because he left his work for good cause. Substantial evidence supports the Board's decision, so we affirm the Board's denial of unemployment benefits to Allen.

II.  *Tribunal Hearing Testimony*

Langston Bag hired Allen to train others to operate some equipment that Allen knew well, but with which Langston Bag was largely unfamiliar.  Langston Bag employed Allen for almost a year—from October 2011 to October 2012.  Langston Bag agreed to give Allen a $10,000 bonus for the first six months of the job to help defray Allen's travel expenses.  Allen lived in Cabot, Arkansas and drove to Langston Bag in West Memphis, Arkansas every day—an approximately 270 mile round trip.  About six months into the job, which was around the time his bonus ran out, Allen began to have significant travel-related problems.  Specifically, he could no longer afford the cost of gasoline, and his car stopped working.  Family issues complicated things too; Allen said, for example, that he had to care for his wife who had back surgery.  Allen borrowed a car from his parents, borrowed gas money, and continued to commute to West Memphis.  He asked his supervisors for help with travel time and expenses, and two supervisors gave Allen a one-time gift of money to help with gas costs.  When asked by the hearing officer whether Allen knew that he would not be receiving a bonus after the six-month time, Allen said: "I hadn't looked that far ahead."

In October 2012, about a week before Allen quit, Langston Bag put Allen on a point system for attendance.  It was disputed whether Allen was reprimanded for missing a day of work during his last week of employment.

Wayne Croom, who testified for Langston Bag, said that the company decided to move Allen to a different position because there was an issue with his performance.  Croom explained that Langston Bag hired Allen to train people on "highly skilled

technical computerized machines" and during the second six months Allen worked there Langston Bag "felt like it wasn't going the way we needed it to go [with Allen.]" That's when, according to Croom, Edward Langston, Langston Bag's general manger, discussed a "new structured plan" for Allen to become a bottomer-machine operator instead of a trainer. Allen told the hearing officer that Edward Langston called him into Langston's office and told him to go home for the day and that Langston Bag would call him if they came up with another job or position. Allen testified that he "never went back."

In addition to the testimony, the hearing officer received as evidence this October 11 email from Edward Langston to Wayne Croom:

> Ronnie & I just met with Chris. He displayed his usual, loafing demeanor in the meeting, but he did express a desire to work 4 10-hour days a week and to operate a bottomer. I explained that we would be making a decision to either (a) develop a new, structured plan for him, or (b) sever ties. I told him to not come in tomorrow, but to await a phone call from us tomorrow afternoon with our decision. I would like to pursue option (a), with us establishing a simpler, structured set of responsibilities and expectations. Here is what I think we should communicate when you and I call him;
> 1. Chris is to report to work Monday thru Thursday for the standard 1-hour bottomer day shift.
> 2. His new job function will be Bottomer Operator.
>                   . . .
> 4. He will be held [to] the standard point system.

A "Consultation" dated 15 October 2012 was also received as evidence during the hearing, which states:

> Edward Langston and Ronnie Reece Shift Manager met with Chris Thursday 10-11-12 to discuss Chris'[s] disposition. During the meeting Chris was given (2) options-#1 Operate a Bottomer 4 (l0) hour days weekly and #2: We would develop a new, structured plan for him in his current capacity. Chris was asked to leave for the day and not to return to work until Edward and I had discussed Chris's disposition. On Sunday 10-14-12 Chris and I discussed the above (2) options and I asked him to call me

Monday 10-15-12 to let us know whether he would accept either of the above terms. As of Wednesday 10-17-12 Chris had not called to discuss his disposition. Due to this fact he has voluntarily resigned from Langston Co. Inc. effective 10-17-12.

### III. *The Board's Decision*

The Board made the following factual findings and conclusions of law:

In the present case, the claimant abandoned the job when he did not contact the plant manager, after being instructed to do so, to advise if he was interested in continuing to work for the employer. During the last week of employment the claimant missed work. The general manager called the claimant into the office to advise that the claimant was missing too much work. The claimant apparently explained he was having trouble getting to work because the two hour one-way commute from Cabot to West Memphis was too expensive and tiresome. The general manager said that the employer would consider other work options and contact the claimant.

The plant manger testified that the claimant was subsequently contacted and offered a new position operating a machine. The general manager told the claimant to consider the offer and let the employer know. On Sunday October 14, 2012, the plant manager telephoned the claimant to ask what the claimant decided. The plant manager recalled that the claimant had not decided. He instructed the claimant to contact him the next day with a decision. The plant manager never heard from the claimant again. He concluded that the claimant quit the job.

The claimant noted that he did not accept the change because the employer was going to put him on a point system for attendance purposes. Because of the commute distance, and the gasoline expense for the commute, the claimant did not believe the new position would be acceptable.

. . .

The evidence presented does not support a finding that the claimant had good cause connected with the work to leave the work. The claimant accepted the job in West Memphis on the condition that he would receive a bonus after six months of work. He received that bonus, but there was no agreement as to another bonus or to a gasoline allowance after that six month bonus was paid. When the claimant felt that he was no longer being compensated for his commute from Cabot to West Memphis he decided he could not afford the commute. He quit by declining to accept the change in job positions.

Under the facts presented, the Board does not find that the claimant established by a preponderance of the evidence that he left the work for a reason that would be considered good cause connected with the work to be eligible for unemployment insurance benefits.

IV. *Analysis*

This court affirms the Board of Review when its decision is supported by substantial evidence. *Garrett v. Dir., Dep't of Workforce Servs.*, 2014 Ark. 50. Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion. *Id.* We view the evidence and all reasonable inferences in the light most favorable to the Board's findings. *Id.* Even if the evidence could support a different decision, our review asks whether the Board could have reasonably reached its decision based on the evidence presented. *Id.*

Arkansas Code Annotated Section 11-10-513(a)(1) (Repl. 2012) provides that "an individual shall be disqualified for benefits if he or she voluntarily and without good cause connected with the work left his or her last work." When a claimant has voluntarily quit work and is seeking unemployment-insurance benefits, the claimant must show by a preponderance of the evidence that he or she had good cause connected with the work for quitting. *Davis v. Dir., Dep't of Workforce Servs.*, 2013 Ark. App. 515. Good cause is that which would reasonably impel the average able-bodied, qualified worker to give up employment and depends on the facts and circumstances in a case. *Id.*; *see also Magee v. Dir., Dep't of Workforce Servs.*, 75 Ark. App. 115, 55 S.W.3d 321 (2001). The term "good cause" can also mean a justifiable reason for not accepting the particular job offered. *Hiner v. Dir., Ark. Employment Sec. Dep't*, 61 Ark. App. 139, 143, 965 S.W.2d 785, 787 (1998).

An employee's refusal to continue employment must not be arbitrary or capricious; and the reason must be connected with the work itself. *Id.*

Allen argues that he did not voluntarily leave work after Langston Bag discontinued travel assistance, that he had good cause to terminate his employment when he was reassigned to a different position, and that the Board lacked substantial evidence to rule against him.

Regarding his argument that he did not voluntarily leave his employment, Allen cites *Missouri v. Dir., Dep't of Workforce Servs.*, 84 Ark. App. 172, 137 S.W.3d 436 (2003). There, the claimant had no car and depended on public bus transportation to and from work. We held that reasonable minds could not find that Missouri quit his work given the lack of transportation; instead, Missouri was discharged when the plant manager suddenly decided to discontinue the employer's practice of providing a substitute worker for Saturday overtime work when Missouri did not have access to public transportation to get to work. *Id.* at 176, 137 S.W.3d at 439. Allen says his case is like *Missouri* because Langston Bag suddenly decided to discontinue its practice of helping him with travel expenses, making his departure involuntary or, alternatively, voluntary with good cause.

We disagree. Substantial evidence supports the Board's finding that Allen abandoned his job when he did not contact the plant manager, after being instructed to do so, to tell the company if he wanted to continue working for Langston Bag. The Consultation sheet and Croom's testimony support this point. Allen testified that he "had no choice but to quit" and that he "never went back." But the Board's finding that Allen quit voluntarily is supported by substantial evidence.

The more pressing issue is whether Langston Bag's decision not to extend its practice of helping Allen with travel expenses with a bonus created good cause for Allen to quit. The Board found that Allen and Langston Bag had no agreement that another bonus or gasoline allowance would issue after Langston Bag paid Allen the initial six-month bonus. When asked by the hearing officer whether Allen knew that he would not be receiving a bonus after six months to help with travelling costs, Allen replied, "I hadn't looked that far ahead." We find that, here, unlike in *Missouri*, there was no sudden policy shift by the employer. What is more, Allen had access to private transportation at all times—Missouri, on the other hand, relied on a public-bus schedule.

Langston Bag honored its promise to pay the $10,000 bonus but decided to not help Allen further with the commuting costs after the bonus was spent. When viewed favorably to the Board, the evidence suggests that, when Allen was hired, he might not receive reimbursement beyond the initial bonus. We hold that substantial evidence exists to support the Board's finding that Allen's unreimbursed commuting costs was not a good cause to quit his employment.

For Allen's second point—that he had good cause to terminate his employment when he was reassigned to a different position—he cites *Lewis v. Dir., Dep't of Workforce Servs.*, 84 Ark. App. 381, 141 S.W.3d 896 (2004). In *Lewis*, we concluded:

> Appellant had worked for Ace for nearly twenty years. After five years of complaining to all levels of management about being reassigned to a position that, in his experience, caused him to lose pay, after offering to assist with training other employees, and after having management violate its own seniority rules and take virtually no action to provide a permanent remedy, appellant quit. We agree with appellant that his circumstances would reasonably impel an average, able-bodied, qualified worker to give up his or her employment. *Id*. at 387, S.W.3d at 900.

This case is different from *Lewis*.  Unlike in *Lewis*, here we have no evidence that Allen complained to management about a loss of pay in the new position or that the new position would be more dangerous than his job as a trainer.  In fact, no party produced evidence on whether the pay was higher, lower, or the same for the new position that Langston Bag offered Allen.  Further, Allen did not raise the issue of danger below, so we will not consider it here.  *Hiner, supra*.  As for the attendance-related point system, the Board stated this as one reason why Allen did not accept the change of position and, we believe, could have reasonably determined that Allen's dissatisfaction with the attendance policy did not amount to good cause.  In sum, substantial evidence supports the Board's conclusion that Allen did not prove he had good cause to end his employment with Langston Bag when he had the option to be reassigned.

For his final argument, Allen cites *Ballard v. Dir., Dep't of Workforce Servs.*, 2012 Ark. App. 371, for the proposition that the Board lacked substantial evidence to rule against him.  In *Ballard*, an employee quit because he could no longer work as a travelling salesman after his car was repossessed.  We held that Ballard had good cause for quitting his work because his employer had not paid him for several weeks of work, Ballard's lack of a paycheck led directly to his car being repossessed, and the job required Ballard to provide his own transportation as a small-business resale representative.  *Id*.

Allen argues that, like Keith Ballard, he lost his vehicle due to his work conditions and was forced to borrow a vehicle from his parents.  Allen also argues that, as in *Ballard*, the Board in this case focused on a superficial reason for denying benefits—that Allen could no longer afford the commute—instead of focusing on the real issue, which was that

"he was strung along by reassurances from management that 'better arrangements' would be made in the future." We are not persuaded. Langston Bag paid Allen for the work he did. The extent to which Langston Bag's promised to extend a bonus or supplement Allen's commuting cost was disputed at the hearing, and we defer to the Commission's resolution of disputed facts when the record supports the final decision.

Affirmed.

WYNNE and GLOVER, JJ., agree.

*Vaughan & Friedman Law Firm, PLLC*, by: *Craig Friedman*, for appellant.

*Phyllis A. Edwards*, for appellee.